**CIBA–GEIGY CORPORATION, Appellant,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY.**

No. 85–5793.

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1986.

Decided Sept. 2, 1986.

As Amended Sept. 9, 1986.

Kenneth W. Weinstein, with whom Peter M. Gillon, Washington, D.C., was on the brief, for appellant. Thomas C. Papson, Washington, D.C., also entered an appearance, for appellant.

Laura E. Frossard, Atty., Dept. of Justice, with whom Edward J. Shawaker, Atty., Dept. of Justice, Michael S. Winer and Timothy D. Backstrom, Attys., U.S. E.P.A., Washington, D.C., were on the brief, for appellee. Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for appellee.

Before STARR and SILBERMAN, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting Opinion filed by Circuit Judge SILBERMAN.

STARR, Circuit Judge:

Ciba-Geigy Corporation appeals from an order of the District Court dismissing its complaint on grounds of ripeness. The gravamen of Ciba-Geigy's complaint is that the Environmental Protection Agency required it to change the labeling of its registered pesticide, simazine, without affording the Company an adjudicatory hearing required by section 6(b) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA or Act), 7 U.S.C. § 136d(b) (1982). For the reasons that follow, we conclude that Ciba-Geigy's claim is ripe for review and remand it to the District Court for adjudication.

## I

Under FIFRA, all pesticides sold, distributed or received in the United States must be registered by EPA. 7 U.S.C. § 136a(a). An applicant for registration is required to file, among other things, a copy of the labeling of the pesticide and data supporting the product's safety and efficacy. Id. § 136a(c)(1)–(2) (1982 & Supp. II 1984). EPA will not approve a registration unless it determines that the proposed labeling satisfies FIFRA's requirements and that the pesticide "when used in accordance with widespread and commonly recognized practice ... will not generally cause unreasonable adverse effects on the environment." Id. § 136a(c)(5). When it appears that a registered pesticide no longer conforms to these standards, EPA may seek to cancel the product's registration or change its classification. Id. § 136d(b).[1] Section

---

1. If the registered product is found to pose an    "imminent hazard," the EPA may suspend the

6(b) of the Act, however, expressly grants registrants the right to a formal, public hearing and the views of a Committee of the National Academy of Sciences and a Scientific Advisory Panel before the proposed cancellation or classification change takes effect. *Id.* § 136d(b); *see also id.* §§ 136d(d), 136w(d) (1982 & Supp. II 1984).

A separate section of FIFRA renders unlawful the sale, distribution or receipt of "misbranded" pesticides. *Id.* § 136j(a)(1)(E). The Act provides twelve definitions of a misbranded pesticide, three of which are pertinent here:

A pesticide is misbranded if—

the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with ... are adequate to protect health and the environment;

the label does not contain a warning or caution statement which may be necessary and if complied with ... is adequate to protect health and the environment; or

the labeling does not contain a statement of the use classification under which the product is registered.

*Id.* § 136(q)(1)(F), (1)(G), (2)(B). Misbranded pesticides are subject to seizure, *id.* § 136k(b)(1)(A), and persons who unlawfully use misbranded pesticides are subject to a " 'stop sale, use, or removal order,' " *id.* § 136k(a), and civil and criminal penalties, *id.* § 136*l* (a), (b).

Ciba-Geigy manufactures and sells chemical products, including the pesticide simazine. Simazine has been registered by EPA since 1957 for use on various agricultural, industrial and aquatic sites to control weeds and algae.

During the 1970's, EPA pursuant to Congressional mandate began the lengthy process of reregistering all pesticides. *See id.*

§ 136a(g). In April 1984, EPA promulgated a "Registration Standard" for simazine, setting forth the agency's evaluation of available data and its position regarding the measures necessary to bring simazine into compliance with FIFRA's registration criteria. Joint Appendix (J.A.) at 45–59. In the Registration Standard, EPA expressed concern about simazine contamination of groundwater. On the basis of that potential hazard, EPA directed additional studies to assess fully the environmental effects of simazine prior to its ultimate reregistration. In addition, the Registration Standard imposed a deadline of December 31, 1984, for changing simazine's classification from general use to "restricted use," for changing the product's label to indicate the use restriction, and for including a warning against use of simazine in areas with specified soil and groundwater conditions.

EPA sent a follow-up notice in July to all twenty simazine registrants reiterating the agency's concern about groundwater contamination, the need for interim restrictions on simazine's use, and the need for modification of the product's label. This notice further stated that "[t]he Agency intends to institute cancellation proceedings to cancel under FIFRA section 6(b)(1) all end-use products containing simazine ... not bearing the required labeling changes as specified above by December 31, 1984." J.A. at 61.

On December 21, 1984, EPA advised simazine registrants by mailgram of a revised labeling statement concerning the groundwater hazard and of a new deadline, January 30, 1985, for the labeling change. The opening paragraph of the mailgram concluded with the following warning: "Affected stocks shipped after that date without the required changes will be considered misbranded." J.A. at 62.[2] The mailgram also advised registrants that "[i]f

registration immediately pending a cancellation hearing. *Id.* § 136d(c)(1). The registrant, in turn, has the right to an "expedited hearing before the Agency on the question of whether an imminent hazard exists." *Id.*

2. The pertinent portions of the mailgram are reproduced in the Appendix to this opinion. The language, which our dissenting colleague believes was merely "suggested in passing," Dissent at 441, speaks for itself.

revised labels are not submitted, it will be necessary to take steps to cancel the registration(s)." J.A. at 63. After the July and December notices were dispatched by EPA, 17 of the 20 simazine registrants either complied with the new labeling requirements or voluntarily cancelled their registration.

In January 1985, Ciba-Geigy's counsel wrote the Director of EPA's Office of Pesticide Programs setting forth Ciba-Geigy's position "that the proposed label changes are unwarranted and therefore [the Company] does not intend voluntarily to implement the requested changes." J.A. at 64. The stated purpose of the letter was to obtain clarification from EPA concerning the procedure by which the agency intended to enforce the label changes. In particular, Ciba-Geigy expressed its understanding that EPA was obliged to follow the registration cancellation process set forth in section 6(b) of FIFRA before it could bring a misbranding action against a pesticide registrant for failure to comply with proposed labeling changes. Ciba-Geigy observed that, despite this statutorily mandated procedure, EPA's December 21 mailgram suggested that EPA could bring an enforcement action for misbranding without first cancelling Ciba-Geigy's existing registration.

Shortly after Ciba-Geigy submitted a second request to the agency for clarification in early March 1985, EPA's Director of Pesticide Programs responded by letter advising that "[i]t is the Agency's position that any [simazine] products not bearing the required statement of restricted use classification or groundwater advisory statement and sold, distributed, shipped, or released for shipment by Ciba-Geigy Corporation after January 30, 1985 are misbrand-

ed under §§ 2(q)(1)(F), 2(q)(1)(G), and/or 2(q)(2)(B) of FIFRA" and subject to "appropriate enforcement action concerning misbranded products under FIFRA." J.A. at 69–70. In the letter, the Director expressly warned the registrant that "the Agency does not agree with your interpretation" of FIFRA, namely that the section 6(b) notice and hearing procedures for registration cancellation are the sole means by which EPA may require a registrant to make labeling changes. *Id.* at 69.

Ciba-Geigy thereupon filed suit in federal district court seeking declaratory and injunctive relief against EPA for imposing labeling changes and use restrictions on a registered product without affording the procedures mandated by section 6(b) of FIFRA. The complaint briefly chronicled the series of mailings through which EPA, in effect, denied Ciba-Geigy a cancellation hearing, including the April 1984 Registration Standard, the July and December 1984 notices and the March 1985 letter. The Company further alleged that since receipt of EPA's December 21 mailgram it had halted shipment of all simazine products which do not satisfy EPA's new labeling requirements; it also asserted that compliance with those requirements would occasion a 50 percent loss in sales because users would instead turn to unrestricted alternative herbicides.[3]

Two days after Ciba-Geigy filed suit, EPA sent another letter to the Company. J.A. at 71–72. This letter reaffirmed EPA's position that under FIFRA the agency enjoys authority to require all simazine registrants to provide the groundwater contamination warning on the label by threatening immediate EPA enforcement action for misbranding under sections 2(q)(1)(F) and 2(q)(1)(G) of the Act.[4]

---

**3.** We are informed that since the filing of its complaint, Ciba-Geigy has changed the labeling of five simazine products to conform to EPA's new requirements and has stopped selling its six other simazine products.

**4.** EPA also stated in the letter that, although it would continue to require immediate compliance with new label warnings concerning groundwater contamination, it had decided to

seek restricted use classification of simazine through a cancellation proceeding or a rulemaking. The agency further agreed that it would not bring any misbranding enforcement action against Ciba-Geigy for omitting a statement of the restricted use classification on its simazine labeling until Ciba-Geigy had an opportunity to present its views regarding the need for such a change in classification at a cancellation hear-

On cross-motions for summary judgment and EPA's motion to dismiss for lack of ripeness, the District Court dismissed the complaint on the ground that EPA "has neither issued a final order directed to the plaintiff Ciba-Geigy nor taken any other final action which is reviewable by the Court." 607 F.Supp. 1467, 1468 (D.D.C. 1985). Although recognizing that the "complaint stems from a series of mailings," the District Court focused exclusively on the December mailgram and determined that under the standards articulated by the Supreme Court in *FTC v. Standard Oil Co. (SOCAL)*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), "the mailgram may not be deemed final agency action and is itself devoid of legal effect." 607 F.Supp. at 1468–69.

From this adverse decision, Ciba-Geigy filed the present appeal. We are informed that EPA has taken no action to date to cancel Ciba-Geigy's simazine registration on the basis of the absence of a groundwater advisory statement.[5]

## II

The sole question before us is whether Ciba-Geigy's complaint presents a controversy ripe for judicial review. Ripeness doctrine serves two important functions as a limitation on judicial review of agency action. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). First, it prevents judicial involvement in abstract or remote controversies that are likely never to require resolution or likely to evolve substantially before resolution becomes necessary. Thus, the ripeness principle conserves judicial resources for cases in which those resources are truly needed and may be efficiently employed. Second, the doctrine enables agencies to deliberate and craft policy

cy free of judicial interference until administrative action has a direct and immediate impact. Judicial intervention into agency decisionmaking at an earlier stage "denies the agency an opportunity to correct its own mistakes and to apply its expertise." *SOCAL*, 449 U.S. at 242, 101 S.Ct. at 494.

The framework for analyzing the ripeness of pre-enforcement agency action is well established. Under the two-part test set forth by the Supreme Court in *Abbott Laboratories*, we must consider "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515. Fitness and hardship function as independent but related variables, the former as a measure of the interests of the court and agency in postponing review and the latter as a measure of the challenging party's countervailing interest in securing immediate judicial review. The judiciary's ultimate determination of ripeness in a specific setting depends on a pragmatic balancing of those two variables and the underlying interests which they represent. *Continental Air Lines, Inc. v. CAB*, 522 F.2d 107, 125 (D.C. Cir.1974) (en banc); *see also* 4 K. Davis, *Administrative Law Treatise* § 25:15, at 405 (2d ed. 1983).

Under this "practical common sense" approach, the ripeness inquiry does not turn on nice legal distinctions. *Continental Air Lines*, 522 F.2d at 124. Courts confronted with close questions of ripeness are appropriately guided by the presumption of reviewability, especially when the affected person is confronted with the dilemma of choosing between disadvantageous compliance or risking imposition of serious penalties. *Id.* at 128; *see also* 4 K. Davis, *supra*, § 25:6–7.

---

ing or rulemaking. Ciba-Geigy thereupon dismissed voluntarily that part of its complaint challenging EPA's method for enforcing the proposed restricted use classification.

**5.** With respect to its decision to reclassify simazine for restricted use, EPA did issue a notice of intent to cancel simazine's general use registra-

tion. *See supra* note 4. The FIFRA Scientific Advisory Panel, however, found that existing data—indicating no toxic effects to humans after 27 years of extensive use of simazine—"are adequate until more detailed studies can be completed and reviewed." Appellant's Brief (Addendum 2 at 2).

■ The inquiry as to fitness for review encompasses several factors, including whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final. *See, e.g., Abbott Laboratories,* 387 U.S. at 149–52, 87 S.Ct. at 1515–17; *Gardner v. Toilet Goods Association,* 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967). It is beyond peradventure that the first two of these factors are satisfied here. The principal issue presented to the District Court was one of statutory interpretation: whether EPA properly construed FIFRA to allow it to impose labeling changes on registered pesticides without following the cancellation process prescribed in section 6(b). The parties agree that this is a purely legal issue.[6] Both sides moved for summary judgment in the District Court on this point, and EPA has not sought to justify its interpretation of the Act on the basis of the specific facts of the case. As in *Abbott Laboratories* itself, "both sides have approached this case as one purely of congressional intent," 387 U.S. at 149, 87 S.Ct. at 1515; moreover, we have no reason to believe that our consideration of the issue would be facilitated by further factual developments.

We next turn to the question whether the agency action is sufficiently final that either the judiciary or the executive has little or no interest in postponing review. The term "agency action" encompasses an agency's interpretation of law. *National Automatic Laundry & Cleaning Council*

*v. Shultz (NALCC),* 443 F.2d 689, 698 (D.C.Cir.1971). It is therefore the finality of that interpretative position which is relevant for purposes of determining the ripeness of the statutory question.

The District Court, however, embarked on a different analysis. The District Court concluded that EPA had taken no final misbranding action against Ciba-Geigy and that the absence of any final action in this respect rendered the controversy unripe. But as we have seen, Ciba-Geigy's complaint did not challenge the merits of EPA's labeling requirements or the sufficiency of EPA's case for misbranding. It raised instead a pure legal question as to what procedures EPA was obliged to follow before requiring a labeling change. That narrow legal question is entirely independent of and separable from the largely factual question whether simazine poses a substantial danger of groundwater contamination. *Cf. SOCAL,* 449 U.S. at 241, 246, 101 S.Ct. at 493, 496 (agency's issuance of complaint initiating enforcement action held not separable from agency's ultimate enforcement decision when determining whether agency action is sufficiently final to permit judicial review). The pertinent inquiry before the District Court was whether EPA has taken final action with respect to Ciba-Geigy's asserted statutory right to a cancellation hearing.

■ As the Supreme Court has instructed, we are to apply the finality requirement in a "flexible" and "pragmatic" way. *Abbott Laboratories,* 387 U.S. at 149–50, 87 S.Ct. at 1515–16.[7] In particular, we look

---

**6.** The dissent's contention that "[t]he case or controversy requirement strongly suggests that there can be no such creature [as a pure question of law]" is difficult to fathom. Dissent at 443 n. 3. The term "pure question of law" merely reflects the truism that a case or controversy sometimes turns entirely on an issue of law where the facts are not in dispute.

**7.** The dissent charges that our pragmatic approach to finality "suggests a casual treatment of the plain language" of the statutory requirement of final agency action. Dissent at 443. This contention is, niceties aside, a thinly disguised attack on the Supreme Court's interpretation of the statutory requirement of finality.

*See generally Mathews v. Eldridge,* 424 U.S. 319, 331 n. 11, 96 S.Ct. 893, 901 n. 11, 47 L.Ed.2d 18 (1976).

Even if we were at liberty to reject the teachings of *Abbott Laboratories* and its progeny, which we emphatically are not, we would find the dissent's criticism unpersuasive. We question the premise that the phrase "final agency action," 5 U.S.C. § 704 (1982), conveys some settled, inflexible meaning that precludes pragmatic or functional considerations. *See also* 7 U.S.C. § 136n(a) (FIFRA provision authorizing judicial review of "final Agency actions"). In particular, we are unpersuaded that the statutory language prohibits us from considering

primarily to whether the agency's position is "definitive" and whether it has a " 'direct and immediate ... effect on the day-to-day business' " of the parties challenging the action. *SOCAL,* 449 U.S. at 239, 101 S.Ct. at 493 (quoting *Abbott Laboratories,* 387 U.S. at 151–52, 87 S.Ct. at 1516–17). These indicia of finality are ordinarily controlling because they are highly probative of whether the agency's position is merely tentative or, on the other hand, whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position. The interest in postponing review is powerful when the agency position is tentative. *See, e.g., Public Citizen Health Research Group v. Commissioner, FDA,* 740 F.2d 21, 31 (D.C. Cir.1984); *Continental Air Lines,* 522 F.2d at 125. Judicial review at that stage improperly intrudes into the agency's decisionmaking process. It also squanders ju-

dicial resources since the challenging party still enjoys an opportunity to convince the agency to change its mind. *See Public Citizen Health Research Group,* 740 F.2d at 31; *Continental Air Lines,* 522 F.2d at 125. Once the agency publicly articulates an unequivocal position, however, and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review.

■ Both the criteria of "definitiveness" and "direct and immediate effect" suggest that EPA's position is final. The March 1985 letter to Ciba-Geigy from EPA's Director of Pesticide Programs unequivocally stated EPA's position on the question whether registrants were entitled to a cancellation hearing before labeling changes could be required.[8] Not only did the state-

---

whether final agency action has resulted from a series of agency pronouncements rather than a single edict. Nor does the dissent advance any principled reason for its refusal to consider the cumulative effect of the agency's actions on Ciba-Geigy and its alleged statutory right. Its approach is the familiar one of divide and conquer.

But Congress gave no indication that it intended the finality requirement to be applied in the hypertechnical fashion championed by the dissent. To the contrary, the legislative history of § 704 suggest that Congress was merely codifying the self-imposed judicial practice of exercising restraint in reviewing tentative agency action. *See generally Carter/Mondale Presidential Comm., Inc. v. FEC,* 711 F.2d 279, 284 n. 9 (D.C.Cir.1983).

8. Under logic and settled law, the fact that the letter was a response to inquiries by Ciba-Geigy did not preclude the agency from expressing a final position in that document. *See Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 583, 100 S.Ct. 1889, 1893, 64 L.Ed.2d 525 (1980). *But see* Dissent at 444.

The dissent asserts that by considering EPA's March 1985 letter we improperly sustain jurisdiction on a theory not advanced by plaintiff. Dissent at 441. But, as noted *supra* at page 432, the complaint expressly identifies the March 1985 letter as one of a series of steps taken by EPA that had the practical effect of imposing labeling changes on Ciba-Geigy without affording it a hearing. J.A. at 9. Unlike the dissent, which would apparently bring back code pleading and overturn *Abbott Laboratories* in one fell swoop, we do not believe that the failure of the complaint specifically to label the

March letter as a "final order" precludes us from considering whether that letter sufficiently clarified the action taken by the agency in the December mailgram to render that action ripe for judicial review.

In our view, it is the dissent that distorts the substance of the complaint in order to deny jurisdiction on a theory not advanced by the plaintiff. The dissent would find Ciba-Geigy's challenge unripe on the ground that "[a] threat to commence misbranding proceedings is equivalent to an agency's 'probable cause' determination or preliminary finding that enforcement proceedings are justified. Such actions have long been thought to lie outside the realm of 'final agency action.' " Dissent at 442–43 (citations and footnote omitted).

The analogy to probable cause determinations would indeed be controlling, as Ciba-Geigy commendably concedes and we forthrightly acknowledge, if the Company were seeking a declaratory judgment that the available scientific evidence does not warrant a misbranding action. But the complaint before us seeks no such relief; rather, it is based on the entirely separate legal theory that the Act requires EPA to bring a cancellation hearing when it wants to change the labeling requirements for a registered pesticide. Because the complaint states a colorable allegation that Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1657, 84 L.Ed.2d 714 (1984), we are not at liberty to decline jurisdiction for fear of interfering with prosecutorial discretion. *Cf. Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

ment of position admit of no ambiguity, *cf. Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986) (issue may be unfit for judicial review when "further administrative action is needed to clarify the agency's position"), but it gave no indication that it was subject to further agency consideration or possible modification. *Cf. SOCAL,* 449 U.S. at 241, 101 S.Ct. at 493 (agency statement of position held not definitive when "[i]t represents a threshold determination that further fdinquiry is warranted"); *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515 ("[N]o claim is made here that further administrative proceedings [concerning issue tendered for judicial review] are contemplated."); *Eagle-Picher Industries v. United States EPA,* 759 F.2d 905, 917 (D.C.Cir. 1985) (absence of "equivocal or tentative language" indicates that position was sufficiently final for judicial review). The letter emphatically required Ciba-Geigy's " 'immediate compliance.' " *SOCAL,* 449 U.S. at 239, 101 S.Ct. at 493 (quoting *Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517). Moreover, we have no reason to believe that the EPA Director of Pesticide Programs lacks authority to speak for EPA on this issue or that his statement of the agency's position was "only the ruling of a subordinate official" that could be appealed to a higher level of EPA's hierarchy. *Abbot Laboratories,* 387 U.S. at 151, 87 S.Ct. at 1516 (citing *Swift & Co. v. Wickham,* 230 F.Supp. 398, 409 (S.D.N.Y.1964), *aff'd,* 364 F.2d 241 (2d Cir.1966), *cert. denied,* 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967)). The follow-up letter from EPA was equally definitive, reiterating "the Agency position" that Ciba-Geigy had no statutory right to a cancellation hearing and that the Company must conform to the new labeling requirement on pain of civil and criminal penalties. J.A. at 72.

In addition to its "practical effect," *SOCAL,* 449 U.S. at 242, 101 S.Ct. at 494, EPA's interpretation of FIFRA has a significant "legal ... effect" on Ciba-Geigy. *Id.* It is well settled that "[t]he authoritative interpretation of an executive official has the legal consequence, if it is rea-

sonable and not inconsistent with ascertainable legislative intent, of commanding deference from a court that itself might have reached a different view if it had been free to consider the issue as on a blank slate." *NALCC,* 443 F.2d at 697. *See generally Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We can divine no reason why the letter from the head of the EPA's Pesticide Division, speakding for the agency charged with administering FIFRA, would not be entitled to deference from the least dangerous branch. EPA's steadfast failure to initiate a cancellation proceeding, coupled with the representations of its counsel that EPA construes its statute not to require such a hearing before imposing labeling changes, only serves to confirm the finality of the agency's pre-litigation position. *Compare Church of Scientology v. Internal Revenue Service,* 792 F.2d 153, 162 n. 3 (D.C.Cir.1986) (en banc), *with id.* at 164–66 (Silberman, J., concurring).

Under these circumstances, we see not the slightest danger that judicial review will disrupt the orderly process of administrative decisionmaking. *See, e.g. Bell v. New Jersey,* 461 U.S. 773, 779, 103 S.Ct. 2187, 2191, 76 L.Ed.2d 312 (1983); *SOCAL,* 449 U.S. at 242, 101 S.Ct. at 494. Having definitively stated its position that Ciba-Geigy has no statutory right to a cancellation hearing, EPA has provided its final word on the matter "[s]hort of an enforcement action." *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 586, 100 S.Ct. 1889, 1894, 64 L.Ed.2d 525 (1980); *see also Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970); *Frozen Food Express v. United States,* 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956); *cf. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 112–13, 68 S.Ct. 431, 436–37, 92 L.Ed. 568 (1948) (administrative orders reviewable when they "deny a right ... as a consummation of the administrative process"). With the agency

at rest in this respect, judicial review now will hasten, not delay, resolution of the ultimate question whether the Act requires a cancellation hearing before EPA may impose labelling changes. *Cf. SOCAL*, 449 U.S. at 242, 101 S.Ct. at 494. Nor will judicial review jeopardize the public health or safety. Ciba-Geigy has complied with EPA's labeling changes to date and will presumably continue to do so unless a court holds that the Company is entitled to a cancellation hearing. *See* J.A. at 13; *cf. Abbott Laboratories*, 387 U.S. at 156, 87 S.Ct. at 1519. We conclude, as this court has repeatedly held before, that "an agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review." *Independent Bankers Association v. Smith*, 534 F.2d 921, 929 (D.C.Cir.) (citations omitted), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976).[9] Respect for our coordinate branch of government, as well as fidelity to precedent and common sense, allows for no other conclusion.

**9.** We are aware that the formality attending an agency action may be helpful in determining whether the action is reviewable. *See Abbott Laboratories*, 387 U.S. at 151, 87 S.Ct. at 1516. It is settled, however, that an agency may not avoid judicial review merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation. *See NALCC*, 443 F.2d at 701. Moreover, to hold that an agency may not adopt a final interpretation of its statute without following formal procedures would fly in the teeth of the admonition delivered time and again that agencies, not courts, are to be the shapers and crafters of agency procedures consistent with statutory constraints. *See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Because "administrative reconsideration of the ruling seems quite unlikely," we do not find the relatively informal nature of the agency ruling here to be grounds for postponing review. *Independent Bankers Ass'n*, 534 F.2d at 929; *cf. New York Stock Exchange, Inc. v. Bloom*, 562 F.2d 736, 741 (D.C. Cir.1977) (informal opinion letter held not ripe for review where the letter expressly reserved the possibility that agency's view might change if agency were presented with certain evidence), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978).

The second branch of the ripeness inquiry requires consideration of the hardship that Ciba-Geigy will incur if judicial review is postponed. In our view, the hardship here is indistinguishable from that deemed compelling by the Supreme Court in *Abbott Laboratories*. Just as FDA did in that case, here EPA "purport[s] to give an authoritative interpretation of a statutory provision that has a direct effect on the [Company's] day-to-day business." 387 U.S. at 152, 87 S.Ct. at 1517. The costs of compliance for Ciba-Geigy may be even greater than those the Supreme Court found onerous for Abbott Laboratories. In its complaint, Ciba-Geigy asserted that it would suffer a substantial drop (estimated at 50 percent) in sales due to warnings contained on the EPA–mandated labeling. On appeal, the Company contends that it "continues to suffer economic loss, including reduced sales, erosion of market share and loss of goodwill, as farmers turn to competing products." Appellant's Brief at 6 n. 3; *see supra* note 3.[10] The Company's only alternative to costly compliance with

**10.** Ciba-Geigy's alleged economic loss clearly constitutes a "distinct and palpable" injury, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), that "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976). If the Company prevails on the merits of its complaint, it may lawfully disregard EPA's new labeling requirements for simazine until it has been afforded the opportunity to challenge them at a formal, public hearing. Thus, the dissent plainly errs in contending that "[t]he legal issue which the majority believes was properly before the district court ... has no direct effect on anyone, including the appellant." Dissent at 442, *see also id.* at 440 n. 1 (complaint arguably nonjusticiable "academic debate over points of law").

The dissent nevertheless argues that Ciba-Geigy's claim is unripe for judicial review because the Company has complied with EPA's labeling requirement rather than risk civil and criminal enforcement action for non-compliance. Dissent at 440 & n. 1. Relying primarily on *International Longshoreman's Union Local 37 v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954), the dissent disregards the Supreme Court's more recent pronouncements on the law of ripeness, which "reflect[ ] a greater judicial willingness to

EPA's regulatory directive would be to run the risk of serious civil and criminal penalties for unlawful distribution of "misbranded" products. That is the very dilemma the Court found sufficient to warrant judicial review in *Abbott Laboratories. Cf. SOCAL*, 449 U.S. at 242, 244, 101 S.Ct. at 494, 495 (litigation expenses were only hardship to challenging party of delaying review).[11]

■ For the foregoing reasons, we conclude that the issue presented is fit for judicial review and that EPA's action imposes a sufficient hardship to warrant review now. The court's and agency's interests in postponing review are relatively slight, whereas the regulated entity faces "irremediable adverse consequences" each day that judicial review is delayed. *Toilet Goods Association v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). Under those circumstances, we discern no principled justification for refusing to relieve Ciba-Geigy "of an onerous legal uncertainty." *Continental Air Lines*, 522 F.2d at 128.

By virtue of its disposition of the case, the District Court had no occasion to address the merits of the statutory question presented by the complaint. Similarly, the parties' arguments on appeal were devoted almost exclusively to the ripeness issue. We therefore vacate the judgment and remand the case to the District Court for resolution of the FIFRA issue. *See International Union, UAW v. Brock*, 783 F.2d 237, 251 (D.C.Cir.1986); *cf. Abbott Laboratories*, 387 U.S. at 156, 87 S.Ct. at 1519.

*So ordered.*

## APPENDIX

### SIMAZINE TELEGRAM

BY CERTIFIED LETTER DATED JULY 30, 1984, YOU WERE NOTIFIED OF REQUIRED LABEL CHANGES FOR THESE PESTICIDES. THESE REQUIREMENTS WERE TO ADD A RESTRICTED USE CLASSIFICATION FOR CERTIFIED APPLICATORS AND A GROUNDWATER ADVISORY STATEMENT. WE HAVE REVISED THE GROUNDWATER ADVISORY STATEMENT AS SHOWN BELOW. THESE REQUIREMENTS ARE TO BE PLACED ON LABELS FOR THE ABOVE PESTICIDE(S) ENTERING CHANNELS OF TRADE AS OF JANUARY 30, 1985. AFFECTED STOCKS

---

aid litigants faced with the necessity of risking substantial harm in order to challenge the validity of governmental action." *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1151 (D.C.Cir.1977). In particular, the dissent evidently feels free to reject the principle laid down in *Abbott Laboratories* and faithfully adhered to by this court on numerous occasions that agency action is generally ripe for review when it places a regulated entity in the dilemma of enduring costly compliance measures or risking civil and criminal penalties. *See, e.g., Abbott Laboratories*, 387 U.S. at 152–53, 87 S.Ct. at 1517–18; *Continental Air Lines*, 522 F.2d at 124–28 (en banc). That the lapse of time since judicial review was sought has forced Ciba-Geigy to choose one of its disadvantageous options hardly provides a principled basis for distinguishing *Abbott Laboratories*.

11. Under *Abbott Laboratories*, it is clear that Ciba-Geigy's complaint should not be held unripe merely because EPA has not specified the exact type of enforcement proceeding it is likely to bring against the Company. *See Abbott Laboratories*, 387 U.S. at 153 & n. 19, 87 S.Ct. at 1518 & n. 19. *But see* Dissent at 443 n. 2. It is enough that the agency has put to Ciba-Geigy the "hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions." *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C.Cir.1984); *see Abbott Laboratories*, 387 U.S. at 153, 87 S.Ct. at 1517 (noting "*risk*" of serious criminal and civil penalties) (emphasis added).

It would be inadmissible to attribute Ciba-Geigy's dilemma solely to the statute itself and not to EPA's interpretation. First, such an approach would depend on acceptance of EPA's view of the merits, that is its interpretation of FIFRA. But when "'[t]he issue of harm and the issue on the merits are intertwined,'" we must assume the challenging party's view of the merits in determining ripeness. *Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 94 (D.C.Cir. 1986) (quoting *National Wildlife Fed'n v. Snow*, 561 F.2d 227, 237 (D.C.Cir.1976)). Second, as we have observed, EPA's interpretation of FIFRA has independent legal consequences under settled principles of judicial deference to an agency's interpretation of its statute. *See supra* pp. 437–38.

SHIPPED AFTER THAT DATE WITH-OUT THE REQUIRED CHANGES WILL BE CONSIDERED MISBRANDED.

THE LABEL MUST BEAR THE FOLLOWING RESTRICTED USE STATEMENT AT THE TOP OF THE FRONT PANEL:

\* \* \* \* \* \*

FIVE COPIES OF REVISED LABEL FOR EACH AFFECTED PRODUCT MUST BE SUBMITTED WITHIN 30 DAYS OF RECEIPT OF THIS MAILGRAM. IF REVISED LABELS ARE NOT SUBMITTED, IT WILL BE NECESSARY TO TAKE STEPS TO CANCEL THE REGISTRATION(S).

J.A. at 62–63.

SILBERMAN, Circuit Judge, dissenting:

The majority holds that if a government agency charged with the responsibility of enforcing a federal statute warns a company to stop a practice or face enforcement proceedings, that company may discontinue the practice and nonetheless sue in federal district court under the Declaratory Judgment Act to challenge the agency's interpretation of the statute. I have some doubt over whether this holding is consistent with the strictures imposed by Article III on the power of the federal courts to issue advisory opinions; arguably, no case or controversy is presented when a plaintiff acquiesces to an agency's position, albeit under protest, and then seeks a court order clarifying the governing law.[1] I find it neither necessary nor advisable to reach that issue, however, since the district court was correct in determining that it lacked statutory jurisdiction. Accordingly, I respectfully dissent.

In April 1984, the Environmental Protection Agency issued certain "Registration Standards" (since modified several times) setting forth the agency's tentative views on how certain pesticide manufacturers could bring their products into compliance with statutory requirements. The EPA asked producers of the pesticide simazine

---

1. It appears that Ciba-Geigy has relabeled some of its simazine products in compliance with the EPA's position and has foreborne from shipping others in interstate commerce. Ciba-Geigy has made it quite clear that it does not intend to violate the EPA's directives unless it first secures a judicial ruling that the Act's misbranding provisions may not be brought to bear against it if it does. It might be thought that this lawsuit amounts to a regulated party's "endeavor to obtain a court's assurance that a statute does not govern hypothetical situations that may or may not make the challenged statute applicable." *International Longshoremen's Union Local 37 v. Boyd,* 347 U.S. 222, 224, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954); *see Socialist Labor Party v. Gilligan,* 406 U.S. 583, 586, 92 S.Ct. 1716, 1718, 32 L.Ed.2d 317 (1972). The EPA's posturing may currently place a "chill" upon Ciba-Geigy's business, but the inhibiting effects of prosecutorial warnings, standing alone, may not represent an injury sufficient to warrant judicial intervention—at least absent a claim that the exercise of constitutional rights is deterred. *Compare, e.g., Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). In any event, the EPA has not even delivered an unequivocal threat to seek enforcement of its position through a misbranding proceeding; it has said merely that it "will consider appropriate enforcement action." Letter of March 8, 1985 (J.A. 69). Arguably, neither Ciba-Geigy nor the EPA have displayed sufficient action or purpose to convert their academic debate over points of law into a tangible clash of interests. *Compare Carey v. Population Servs. Int'l,* 431 U.S. 678, 683 n. 3, 97 S.Ct. 2010, 2015, n. 3, 52 L.Ed.2d 675 (1977) (justiciable controversy exists where plaintiff "alleges that it has violated the challenged statute in the past, and continues to violate it in the regular course of its business; that it has been advised by the authorities responsible for enforcing the statute that it is in violation; and that on at least one occasion, it has been threatened with prosecution.").

Rejecting this analysis, the majority suggests that *Boyd* is no longer good law. The majority believes that *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), authorizes a regulated party to challenge an agency's directives in court while complying with those directives. This reading overstates the holding of *Abbott Laboratories.* In that case, the plaintiffs had neither complied with the agency's directives nor stated that they intended to comply unless a court would first assure them that they could do so with impunity. *See* 387 U.S. at 152–53, 87 S.Ct. at 1517–18. And the Supreme Court has not since treated *Abbott Laboratories* as rejecting the teaching of prior cases such as *Boyd. See, e.g., Kleppe v. New Mexico,* 426 U.S. 529, 546, 96 S.Ct. 2285, 2295, 49 L.Ed.2d 34 (1976) (citing *Boyd* approvingly); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 146, 95 S.Ct. 335, 359, 42 L.Ed.2d 320 (1974) (same).

to include on their products' labels an explicit warning that simazine can contaminate ground water and therefore should not be used where ground water is close to the surface or where the soils are very permeable. Ciba-Geigy contests the need for this warning, but since receiving EPA's mailgram of December 21, 1984, it has halted shipment of simazine products that do not contain the desired labels. That communication warned twenty producers that EPA would initiate proceedings to cancel their simazine registrations if the companies did not add the requested warning to their products' labels. The mailgram also suggested in passing that the EPA would regard simazine products shipped without the warning label as "misbranded" under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136(q) (1982 & Supp. II 1984). Ciba-Geigy's counsel subsequently wrote EPA in January 1985 and again in March, to elicit further the agency's views on this point. Ciba-Geigy's counsel noted that misbranded pesticides shipped in interstate commerce are subject to stop-sale orders or seizure procedures, and opined that EPA had no authority to seek such enforcement against Ciba-Geigy unless it first cancelled the company's existing simazine registration in an administrative cancellation proceeding under Section 6(b) of FIFRA, *id.* § 136d(b). EPA responded by letter in March, stating, "Please be advised that the Agency does not agree" with Ciba-Geigy's "premise" that the agency is required to initiate cancellation proceedings before it may "issu[e] a stop-sale order or tak[e] other appropriate enforcement action concerning misbranded products under FIFRA." Letter of March 8, 1985 (J.A. 69). The agency was less clear about whether it intended to exercise its asserted authority to proceed with a misbranding action. It stated that the initiation of cancellation proceedings (Ciba-Geigy's preferred alternative) was "under active consideration," but also warned that "should Ciba-Geigy elect to ship any simazine products with labeling which omits the required statement ... the Agency will regard such products as mis-

branded and *will consider* appropriate enforcement action." *Id.* (emphasis added).

Ciba-Geigy immediately brought this action, alleging that the December 21, 1984 mailgram was a reviewable "final order." Complaint for Declaratory and Injunctive Relief ¶ 14 (J.A. 9). The district court held otherwise. On appeal, Ciba-Geigy has shifted its position, conceding that the mailgram was not by itself final agency action, *see* Brief for Appellant at 11; the company now maintains that "[t]he action that Ciba-Geigy is challenging is not the enforcement threat, but the labeling change required by the Registration Standard." *Id.* at 15. That earlier document, however, was intended merely to provide "guidance for the reregistration of pesticide products" (J.A. 48), i.e., to solicit voluntary compliance with the EPA's views on pesticide safety. It explicitly recognized that any *coercive* legal order against a company could come only through a formal procedure such as a cancellation proceeding (J.A. 46). The Registration Standard expressed the agency's concerns about simazine and ground water and set forth the agency's view that labeling changes must be made by the end of 1984; however, it did *not* discuss the interrelationship between cancellation proceedings and misbranding proceedings—an issue which arose only in the parties' exchange of letters after EPA's mailgram. The majority takes a third course and treats EPA's March 1985 letter, in which the agency first explicated its view that FIFRA's misbranding provisions are independently enforceable, as the final agency action, even though that letter went no further than to warn Ciba-Geigy that EPA "will consider appropriate enforcement action" if the company continued to distribute misbranded simazine. By treating the letter as the administrative action challenged, the majority not only "sustain[s] [jurisdiction] on a theory that the plaintiff has not advanced," *Merrell Dow Pharmaceuticals Inc. v. Thompson,* —— U.S. ——, ——, 106 S.Ct. 3229, 3233 n. 6, 92 L.Ed.2d 650 (1986), it implicitly rejects Ciba-Geigy's concession

that an enforcement threat itself is not final agency action.

In truth, all of this confusion is reflective of the underlying analytical weakness in appellant's case: EPA has in no sense taken final action; the agency has merely warned Ciba-Geigy, in response to inquiries by the company's counsel, that it will consider enforcement action if the company resumes shipment of simazine without what it regards as the necessary warning on Ciba-Geigy's labels. The EPA's actions simply represent efforts by an agency to provide informal guidance to a regulated party on how to comply with a statute and, perhaps, to conserve agency resources by "persuading" that party to comply without resorting to enforcement proceedings. For that reason, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), does not control this case. There the Supreme Court addressed a pre-enforcement challenge to agency regulations; the Court was faced with the question of whether a declaratory judgment should be withheld on discretionary, equitable grounds—whether the controversy was sufficiently ripe to warrant judicial intervention. *See id.* at 148–49, 87 S.Ct. at 1515–16. Only part of the court's analysis dealt with the statutory jurisdictional issue of whether the agency regulations at issue were "final agency action" under section 10 of the APA, 5 U.S.C. § 704 (1982). The regulations were clearly "agency action," and the Court concluded they were "final" as well because of their definitive status and quasi-legislative character: the regulations "purport[ed] to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies." *Id.* at 152, 87 S.Ct. at 1517. If within the Commission's authority, the Court noted, the regulations had "the status of law." *Id.* at 152, 87 S.Ct. at 1517. *Accord Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112–13, 68 S.Ct. 431, 436–37, 92 L.ed. 568 (1948) ("[A]dministrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process.").

The legal issue which the majority believes was properly before the district court, by contrast, has no direct effect on anyone, including the appellant. The EPA's view of its enforcement options does not impose any substantive duty upon a regulated party in the way that the regulations in *Abbott Laboratories* did; "only some action consequent upon [it can] give it legal life." *Abbott Laboratories*, 387 U.S. at 147, 87 S.Ct. at 1514 (discussing *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950)). Whether EPA is correct in asserting that it has authority to seek a stop-sale order against a product without first cancelling the producer's existing registration is an academic issue unless and until EPA actually pursues that course. No one, I suppose, would claim that the federal courts would have jurisdiction to entertain a challenge to that interpretation in the absence of a *threat* to bring a misbranding proceeding. That would be a mere declaration by the agency that it has authority in the abstract to seek a stop-sale order under the statute. Without a warning of possible enforcement action, then, the legal interpretation upon which the majority focuses could not possibly constitute final agency action.

The agency's warning, on the other hand, whether contained in the mailgram or the subsequent letter, cannot be regarded as final agency action without "turning prosecutor into defendant." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 243, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980) (*SOCal*). Judicial review of a mere threat of enforcement would constitute a departure from the tradition of deference to prosecutorial discretion and an untoward encroachment on the doctrine of the separation of powers. *See United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). By requiring the district court to entertain Ciba-Geigy's claim, this court "lend[s] sup-

port to the notion that federal courts have a 'carte blanche' authorizing judicial supervision of almost everything that the Executive Branch of Government may do." *SOCal,* 449 U.S. at 249, 101 S.Ct. at 497 (Stevens, J., concurring). For this reason, even had EPA made clear its intention to proceed by way of a stop-sale order rather than by cancellation, I would not find its action reviewable in advance of an attempt at enforcement. A threat to commence misbranding proceedings is equivalent to an agency's "probable cause" determination or preliminary finding that enforcement proceedings are justified. Such actions have long been thought to lie outside the realm of "final agency action." *See SOCal, supra; Ewing, supra.*[2] Indeed, the appellant's argument seems even weaker than that rejected in *SOCal.* If EPA proceeds against Ciba-Geigy in federal court, the company will have a full opportunity to raise then the legal issue it wants the district court to decide now; by contrast, the plaintiff in *SOCal* might have permanently lost the opportunity to raise its "legal issue"—whether the FTC had reasonable cause to believe it was in violation of the law—once the case proceeded to the merits.

The majority's approach, it might be thought, treats the statutory requirement of final agency action (contained in both the APA, 5 U.S.C. § 704, and in FIFRA, 7 U.S.C. § 136n(a)) not in accordance with its literal terms but only as a metaphor for the equitable doctrine of ripeness. Under this approach, even though not one of a series

of agency actions could by itself be considered "final," the federal courts nonetheless acquire jurisdiction if all actions combined put a putative plaintiff in a sufficiently uncomfortable position and the issue sought to be litigated can be depicted as a "pure question of law."[3] That may be what the majority means when it applies the "pragmatic" test that it draws from *Abbott Laboratories.* Although, as Justice Harlan said, pragmatism plays a role in judicial determinations as to whether a particular agency action is final, it is quite a leap to conclude that pragmatism can obviate the need to identify one agency action as final. Such an approach not only suggests a casual treatment of the plain language of the statute, but also introduces much uncertainty into a federal district court's threshold determination of jurisdiction *vel non.*

Passing all of these hurdles *arguendo,* I disagree with the majority opinion even on its own "pragmatic" terms. First, despite Ciba-Geigy's attempt to portray its challenge as raising a "pure" legal question, I am convinced that consideration of its claim "is likely to stand on a much surer footing in the context of a specific application" of the EPA's asserted authority to proceed through a misbranding action. *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). It is quite conceivable to me that the grounds upon which the EPA contends a particular label is misbranded may bear on the complicated issue of whether a misbranding proceeding may be brought

**2.** Ciba-Geigy's position is further undermined because EPA has *not* finally determined, as far as the record reflects, that it will bring misbranding proceedings against the company, only that it "will consider appropriate enforcement action." Nor is it clear what particular type of enforcement proceeding EPA might choose to bring. Although the majority regards this "onerous legal uncertainty" as justifying judicial intervention, Maj.Op. at 436 (citation omitted), for me it just reinforces the conviction that this case presents "too remote and abstract an inquiry for the proper exercise of the judicial function." *Boyd,* 347 U.S. at 224, 74 S.Ct. at 448; *see Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 750–51 (D.C.Cir.1984).

**3.** Notwithstanding Justice Harlan's use of the term "pure question of law" in *Abbott Laboratories,* I doubt the propriety of that phrase under our constitutional system. The case-or-controversy requirement strongly suggests that there can be no such creature; at some point, a legal challenge may be so "pure" as to constitute a request for an advisory opinion. *See supra* note 1. This does not mean that legal issues must involve *disputed* facts, *but see* Maj.Op. at 435 n. 6, only that such issues must arise in a concrete factual setting. It is noteworthy that the Court in *SOCal* did not refer to the word "pure" in its discussion of *Abbott Laboratories. See* 449 U.S. at 240, 101 S.Ct. at 493.

against a producer whose existing registration has not yet been cancelled. *Cf. id.* at 163–64, 87 S.Ct. at 1524–25. I, for one, feel quite uncomfortable in asking the district court to resolve the fine points of law upon which the parties disagree in so abstract a setting as is involved here. It bears repeating that the EPA has not committed itself or even declared it likely that it will press its interpretation of FIFRA's misbranding provisions in an enforcement proceeding, *see Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 750–51 (D.C.Cir.1984); the agency only articulated its view, in fact, in response to inquiries by Ciba-Geigy's counsel. To be sure, the EPA's response to that inquiry has made Ciba-Geigy quite apprehensive, and to that extent has had a "practical" effect on its business. But focusing solely on the practical consequences of agency action obviously proves too much. Any time a government agency tells a party in a preenforcement context that a particular course of conduct, in its view, would violate a statute, it necessarily rests its view on a series of legal "premises" relating to the statute (coverage of the conduct by the statute is an obvious example)—any one of which, if incorrect, could undermine the agency's enforcement posture. Under the majority's view, for instance, agencies' opinion letters or private letter rulings could be routinely reviewable. *See New York Stock Exchange, Inc. v. Bloom,* 562 F.2d 736 (D.C.Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978) (holding opinion letter unreviewable).

Judicial intervention at this stage cannot help but interfere with the agency's internal decisionmaking process by pre-empting a prosecutorial judgment. It seems quite clear to me that this premature interference cannot help but impede "effective enforcement of the Act," *Abbott Laboratories,* 387 U.S. at 154, 87 S.Ct. at 1518,

because it will enmesh the EPA in a dispute over a legal issue that the agency has not and, for all we know, may never put to the courts. This sort of gamesmanship ties up the EPA's resources and impairs its ability to undertake the ambitious task, which Congress has assigned to it, of reinvestigating the safety of pesticide products currently on the market.

Second, I do not agree that the hardship Ciba-Geigy faces is qualitatively any greater than that faced by any company confronted with the prospect that a government agency will sue in federal court if that party continues a practice the agency regards as illegal.[4] The majority correctly points out that Ciba-Geigy is faced with the "dilemma" of whether to comply with the EPA's labeling directives or to disobey them. But this dilemma stems not from the crux of the parties' immediate dispute—whether FIFRA's misbranding provisions are independently enforceable—but rather from the parties' background dispute over simazine's effect on groundwater (which the majority seems to concede is unripe, *see* Maj.Op. at 434). The only burden directly attributable to EPA's assertion of enforcement authority is the prospect that Ciba-Geigy may face litigation. *SOCal* makes clear that the existence of this burden does not compel the conclusion that agency action is "final." *See* 449 U.S. at 242, 244, 101 S.Ct. at 494, 495.

Finally, a pragmatist should take into account the implication of the majority's opinion on the future conduct of enforcement agencies as well as the static interests of the parties at the time of this lawsuit. In light of the court's decision, how will law enforcement agencies behave in the future? It should be perfectly obvious that the court's opinion will create a strong

---

4. FIFRA authorizes criminal prosecutions for knowing violations of the Act, *see* 7 U.S.C. § 136*l*(b), but prior to filing suit Ciba-Geigy quite reasonably exhibited no concern about that prospect; its January and March 1985 letters focused only on stop-sale or seizure remedies. Whether or not Ciba-Geigy's view that its existing registration provides a shield against misbranding actions is ultimately judged correct, it seems ludicrous to suggest that the government would regard its argument as so insubstantial as to bring a criminal proceeding against the company.

disincentive for agencies to tell parties that a particular course of conduct is regarded as illegal (even when the parties seek such advice). Rather, to protect its internal prosecutorial discretion, it will be safer for the agency to "warn" parties only by filing lawsuits—to shoot first and ask questions later. Agency officials' speeches, letters or other communications previously used to encourage voluntary compliance with agency positions on statutory requirements will have to be carefully designed to obscure clarity of agency expression. How, I should like to ask, does that result serve pragmatism? It does so only if our objective is to encourage litigation.